**ACCESS NOW, INC., et al., Plaintiffs,**

v.

**AMBULATORY SURGERY CENTER GROUP, LTD., et al., Defendants.**

**No. 99109CIV.**

United States District Court, S.D. Florida.

May 2, 2001.

Miguel Manuel De La O, David Everett Marko, De La O & Marko, Miami, FL, for plaintiffs.

Ronald M. Rosengarden, Jennifier Gayle Demberg, Greenburg Traurig, Miami, FL, Amy Wright Littrell, Youndy Christine Cook, Ford & Harrison, Tampa, FL, Frank G. Simpson, III, Nashville, TN, for defendants.

## ORDER ON DEFENDANTS' MOTION FOR DETERMINATION THAT EMERGENCY ALARM STROBE LIGHT PLACEMENT SHOULD CORRESPOND TO STANDARD MEDICAL PRACTICE

GARBER, United States Magistrate Judge.

**THIS MATTER** came to be heard on Defendants' Motion for Determination that Emergency Alarm Strobe Light Placement

Should Correspond to Standard Medical Practice ("Defendants' Motion"). The Defendants asserted that emergency alarm devices should not, as a matter of standard healthcare practice, be placed in certain areas of hospitals, ambulatory surgery centers, and other outpatient facilities where patients may be resting or where supervised medical procedures may be performed. In support of their position, the Defendants offered evidence that standard healthcare and medical industry practice, because of concerns about the integrity of medical procedures and life safety, demands limitations on the placement of emergency alarm devices throughout medical facilities. The Court having considered the relevant portions of the file, as well as memoranda filed by the parties and indications that the parties are in agreement on many of the points raised by the Defendants' Motion, and otherwise being fully advised in the premises, the Defendant's Motion is hereby **GRANTED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs in this action are a class of similarly situated individuals with disabilities who allege that they have been denied equal access to and usability of the facilities of the Defendants, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*—specifically, Title III of that Act. Defendants, Ambulatory Surgery Center Group, Ltd., et al., are separately incorporated entities, affiliated but operationally and financially independent, all engaged in the provision of health care services or in operating facilities at which medical services are provided. The Defendants individually own or operate several hundred medical care facilities, including specialty hospitals, outpatient care facilities, rehabilitation hospitals, professional medical offices, surgical centers, psychiatric hospitals, medical office buildings, and general services hospitals.

Plaintiffs filed suit in this action seeking injunctive and other equitable relief against Defendants for alleged discrimination in access to places of public accommodation, in violation of Title III of the ADA. Subsequently, named Plaintiffs moved for class certification pursuant to Federal Rule of Civil Procedure 23 ("Rule 23") of a class of plaintiffs consisting of all people in the United States with disabilities who have been and who were entitled to the full and equal enjoyment of the goods, services, programs, facilities, privileges, advantages, or accommodations of any of the Defendants' Facilities, but who were denied such full and equal enjoyment due to architectural and/or communication barriers at the Defendants' Facilities. This Court granted certification pursuant to Rule 23(b)(2), as Plaintiffs seek only injunctive relief.

## II. INTRODUCTION

The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. mandates that places of public accommodation and commercial facilities shall be accessible to persons with disabilities. For commercial places of public accommodation, including office buildings and hospitals, this mandate is encompassed within Title III of the ADA, 42 U.S.C. § 12181 *et seq*. ("Title III"). Title III's provisions are implemented through regulations promulgated by the Department of Justice which include guidelines for new construction and alterations. *See* 28 C.F.R. Part 36 and Appendix A. These guidelines are called the Americans with Disabilities Act Access Guidelines ("ADAAG"), and they are drafted and proposed by the U.S. Architectural and Transportation Barriers Compliance Board ("Access Board").

## III. RELEVANT REGULATIONS, GUIDELINES, STANDARDS AND TECHNICAL ASSISTANCE

ADAAG 4.1.3 "Accessible Buildings: New Construction" provides that:

Accessible buildings and facilities shall meet the following minimum requirements:

. . . .

(14) If emergency warning systems are provided, then they shall include both audible alarms and visual alarms complying with 4.28. Sleeping accommodations required to comply with 9.3 shall have an alarm system complying with 4.28. *Emergency warning systems in medical care facilities may be modified to suit standard health care alarm design practice.*

ADAAG 4.1.3 (emphasis in italics added).

ADAAG 4.28 "Alarms" provides the following general requirement: At a minimum, *visual signal appliances shall be provided in buildings and facilities in each of the following areas: restrooms and any other general usage areas (e.g., meeting rooms), hallways, lobbies, and any other area for common use.* ADAAG 4.28.1 (italics in original). *See also ADAAG Manual,* § 4.28.3 which provides:

In general, it is not sufficient to install visual signals only at audible alarm locations. Audible alarms installed in corridors and lobbies can be heard in adjacent rooms but a visual signal can be observed only within the space it occupies. Visual alarms are required in hallways, lobbies, restrooms, and any other general usage and common use areas, such as meeting and conference rooms, classrooms, cafeterias, employee break rooms, dressing rooms, examination rooms and similar spaces. Visual alarms are not required in areas used solely as employee work areas or in mechanical, electrical, or telephone closets, janitor's closets, or similar non-occupiable spaces.

As stated explicitly in ADAAG 4.1.3(14), however, these general requirements may be modified in medical care settings. The ADAAG Manual explains the scoping requirements for Medical Care Facilities as follows:

**Requirements for alarms may be modified in medical care settings according to standard industry practice.** In many health care facilities, personnel responsible for ensuring the safety of patients respond to intercom messages or other signals not intended to alert or alarm patients incapable of independent evacuation. Under industry practices, a supervised emergency response plan is essential and generally does not include installation of alarms in patient rooms and wards.

*ADAAG Manual,* § 4.28, discussing ADAAG 4.1.3(14) "Scoping" (emphasis added).

The Access Board has also issued a technical assistance bulletin on Visual Alarms. *See Bulletin # 2: Visual Alarms* (Access Board 1994) ("*Bulletin # 2*").[1] In Bulletin # 2, the Access Board explains why there is an exception in the scoping requirements of ADAAG 4.1.3(14) for "standard health care alarm design practice":

In medical care settings *where a supervised emergency evacuation plan is in place*, it is usually not desirable to install alarms in patient rooms or wards. In such occupancies, personnel responsible

---

1. Bulletin # 2 may be accessed at and printed from the Access Board website, www.access-board.gov. *See Bulletin # 2: Visual Alarms* (Access Board 1994), http://www.access-board.gov/publications/ 2–VisualAlarms/a7.htm (last visited Dec. 1, 2000).

for ensuring the safe egress of patients will respond to an intercom message or other signal that is not intended to alert or alarm patients incapable of independent evacuation. Additionally, visual alarms may not be appropriate for use in some specialized medical facilities, such as operating rooms, where lighting levels are high and the sudden discharge of a strobe flash might adversely affect a surgical procedure. *For such facilities, the requirements for visual and audible alarms may be modified to suit industry-accepted practices.*

*See Bulletin # 2* (emphasis in italics added).

Accordingly, ADAAG recognizes an exception in the general rules regarding the placement of emergency alarm notification devices to accommodate standard healthcare alarm practice, and specifically approves the public policy underlying this exception. Defendants assert that standard alarm design practice in the healthcare industry limits the placement of emergency alarm notification devices to general common areas, and does not place such devices in those areas of medical facilities where patients will be resting (i.e., patient rooms or wards) or where medical procedures will be performed.

## IV. DISCUSSION

### A. Standard Health Care Alarm Design Practice Dictates Limitations in Placement of Emergency Warning Systems Based on Concerns for Medical, Safety, Life Safety, and Liabilities.

■ Defendants agree that the general rule under operative guidelines and codes is that emergency warning devices should be placed in all common areas of all facilities. Defendants point to the recognized exception for medical care facilities in support of their argument that their facili-

ties—all of which are medical care facilities—should be subject to more limited placement guidelines. For example, Section 4.1.3(14) of 28 CFR Part 36 Appendix A (ADAAG 4.1.3(14)) specifically anticipates that "Emergency warning systems in medical care facilities may be modified to suit standard health care alarm design practice." While Defendants do not point to any *written* standard contained in any industry-wide publication or mandated by any national fire alarm consensus standard for where *not* to place audible and visual emergency alarms, a standard clearly emerges from the design criteria used by healthcare facilities and their designers in planning, installing, and modifying emergency alarm systems in a healthcare setting. The single underlying theme is that visual alarms are not recommended for use in patient rooms (or the restrooms in those patient rooms), surgical or medical procedure rooms, recovery or surgical preparation areas, or in other areas where patients are under the direct care and supervision of medical staff. Defendants' evidence establishes that this design choice is made in response to: medical safety concerns; life safety issues surrounding supervised, orderly evacuations and emergency response, including the fact that safe havens (areas of rescue assistance) and sprinklers limit the need for and scope of evacuations; and tort and statutory liabilities for admitted patients which require hospital staff to govern and guide any evacuation process.

Medical safety concerns dictate some limits on the use and placement of emergency strobe lights in areas where medical procedures will take place and where patients are incapacitated. For example, some types of visual alarms may trigger seizures in patients. *See e.g., Med. Industry Today,* December 19, 1997, Friday (available via Lexis–Nexis) (finding that an estimated 2 million Americans are affected

by epilepsy and seizure disorders, photosensitivity occurs in about 3 percent of children with epilepsy, eighteen percent of children with childhood absence seizures and 30 percent of those with juvenile myoclonic epilepsy and photosensitivity does occur in families where several members may experience seizures in response to flashing lights). Although newer technology and careful testing of light systems can reduce this possibility, the risk is particularly a problem where patients do not have physical mobility to turn their heads or avoid the visual alarm, such as bed-ridden or medicated patients.

Additionally, the evidence established that under the effects of anesthesia, patients could be harmed if startled by sudden discharges of light or abrupt, loud noises. For example, a post-operative patient coming out of anesthesia could be startled and panic, resulting in injury to himself or others.

Finally, and more critically, the sudden discharge of a strobe flash during a surgical or other procedure could adversely affect the integrity of the procedure. In Bulletin # 2, the Access Board wrote that "[v]isual alarms may not be appropriate for use in some specialized medical facilities, such as operating rooms, where lighting levels are high and the sudden discharge of a strobe flash might adversely affect a surgical procedure." For example, a strobe light could startle a physician or other medical professional during a surgical or other procedure. Other delicate procedures such as fertilization or endoscopy could be jeopardized.

The evidence also establishes that life safety concerns dictate that medical facilities should not place emergency notification devices in many patient areas of a facility. Emergency alarm devices should be limited so that patients and visitors will not be panicked and will follow orderly

hospital evacuation directions to appropriate safe locations within the facility. Defendants assert that established policies and procedures are in place that dictate an ordered, controlled evacuation of all or part of a facility, as necessary. If patients and others in their rooms and in medical procedure areas (such as surgical suites) are notified of an emergency through widespread placement of notification devices, they may attempt to evacuate themselves in an uncontrolled and possibly incorrect (and dangerous) fashion.

Established procedures and policies reduce this risk by allowing the hospital to control any evacuation or fire response that may be needed. All medical facilities accredited by the Joint Commission for the Accreditation of Health Care Organizations ("JCAHO"), the primary independent national organization for the accreditation of medical facilities, have life safety plans in effect, as mandated and approved by JCAHO and, usually, the governing state agency, such as, for example, the Florida Agency for Healthcare Administration ("AHCA"). Each of the hospitals and surgical centers herein is JCAHO-accredited. These life safety plans will include plans for emergency response generally and supervised emergency evacuation more specifically. These plans will cover all areas of the hospital where patients and visitors might be found in the ordinary course of business. The effect of the fire response and supervised evacuation plans is to provide procedures whereby personnel will be trained and drilled on emergency response, including evacuation techniques, and evacuations will be conducted in an orderly and standard fashion, with trained facility personnel responsible for the safe removal of all persons from the facility in the event of an evacuation. The existence of this level of established policy and procedure, when considered in light of the

dangers inherent in an uncontrolled, unsupervised evacuation as discussed below, justifies the limited placement of emergency alarm devices.

Furthermore, hospital staff are well-trained in fire response and supervised evacuation procedures. Regulations require that hospitals train every employee at least one time per year on fire rescue procedures and techniques. National standards require that hospitals to have at least one fire drill per shift per quarter. *See JCAHO Standard EC.2.9.2.* Medical facilities and their staff are well equipped to handle emergencies within a medical facility and to respond appropriately to both limited and widespread dangers at the facility. The result is that an evacuation which is controlled by the trained personnel of the facility is a controlled evacuation.

Emergencies should not be announced to sick patients and their concerned family members and visitors out of concern that they will evacuate improperly. In other words, when a facility is evacuated, it is not always evacuated to the location or in the direction that members of the public and medicated patients might assume. Medical facilities are designed so that either part or all of the building constitutes a safe haven (while in older facilities, the safe haven may not consist of the entire building, in newer facilities, the safety features permit the entire building to serve as a safe haven). Building codes require that healthcare facilities, because of the nature of the service provided and the immobility of many patients, be built using smoke barriers, fire-rated walls and, in new construction, be sprinkled for fire safety. Different areas of a facility meeting these requirements are designated as safe zones and will not be evacuated unless the emergency is in that zone. Hospital life safety plans take into account these safe havens

by providing for horizontal evacuation and vertical evacuation to limit the movement of ill patients. Horizontal evacuation is a movement of patients and other persons from one part of a floor to another part of the same floor; vertical evacuation involves movement from one floor to another floor (either higher or lower, depending on the circumstances and the location of the emergency).

It is important to the functioning of these fire response and evacuation procedures that patients not know immediately that there is an emergency in the area. Facility evacuations are conducted as appropriate to the level of the emergency, but emergency alarm notification devices merely sound (or emit) an alarm generally. Thus, an evacuation may be ordered as to only part of one floor, but the alarms will sound in all areas of all floors. Furthermore, alarms may sound even though an evacuation is not indicated, such as in the case of a small, localized event. Staff are informed whether an evacuation will be necessary at all, whether the evacuation will be of the entire building (whole) or only the areas immediately affected by the danger (partial), and whether the evacuation for their particular area will be to another area on the same floor (horizontal) or to another floor (vertical). Alarms cannot provide this information, and therefore serve only to agitate patients and visitors. Furthermore, all staff have designated roles in any emergency response: some will assist in combating the emergency, others will remain in place to maintain calm, and others will actively remove patients in order of their physical and medical needs.

It is important to the safety of patients, visitors, and staff alike that emergency response and evacuations be supervised and controlled by the facility staff. The argument is as follows: If patients are

alerted before staff can take control of a dangerous situation, they could panic; in a panicked state, patients could exacerbate medical conditions, injure themselves, or inadvertently hinder any emergency response or evacuation; worse, patients and visitors could decide to investigate or evacuate themselves. This is dangerous for all concerned, because patients and accompanying visitors could wander inadvertently into the very danger zone from which they intended to evacuate, could be injured in the process, or could endanger hospital staff and rescue personnel when they must be searched out and retrieved. It is only by controlled emergency response and supervised evacuation that a medical facility can ensure the maximum amount of life and medical safety for its patients, guests, and staff.

 A need for limited placement of emergency notification devices is also based on liability concerns, because facilities must control evacuations in order to maintain their necessary supervision over their patients. All of the hospitals and medical facilities involved in this suit engage in a practice of maintaining an updated roster of each and every patient that registers or checks in with the facility, whether the patient is admitted as an inpatient or outpatient. Once a patient is admitted or registered, the facility takes responsibility for this person while they are in the facility's care. Patients cannot be discharged from the medical facility unless discharged by a doctor or self-discharged without doctor approval. If patients leave a facility without being discharged in some fashion, healthcare facilities possibly could be held liable. *See, e.g., Poluski v. Richardson Transp.,* 877 S.W.2d 709, 714 (Ct. App. Mo.1994) (affirming jury verdict against hospital that failed to properly discharge patient); *Torres v. New York,* 44 N.Y.2d 976, 408 N.Y.S.2d 330, 380 N.E.2d

161, 162 (1978) (affirming dismissal of hospital where patient walked out of emergency room and committed suicide, but noting that jury could have found hospital guilty of negligent nonsurveillance of patient). Hospitals and medical facilities are also responsible, perhaps to a slightly lesser degree, for temporarily-admitted patients (out-patients) and other invitees to their facilities, for their safety in the event of an emergency.

In *Gomez et. al. v. United States of America,* 1990 U.S. Dist. LEXIS 373 (E.D.La.1990), the Court reiterated a set of facts in an impleader setting which implicated hospital liability during evacuations. In *Gomez,* a construction contractor repairing the hospital started a fire with his blow torch which required the evacuation of all patients from the hospital. *Id.* at *1. Instead of waiting for the fire to be contained or extinguished, the wife of a patient removed her husband to a relative's home where he later died of congestive heart failure. *Id.* The wife later sued the Unites States of America/Veteran's Administration Hospital, and the hospital sought to shift some or all of the liability to the contractor. *Gomez* demonstrates the potential liabilities and dangers of unsupervised evacuations, which Defendants rely upon in asserting that putting strobe lights in patient rooms and other procedure and patient areas would encourage patients to leave medical facilities on their own in times of emergency. As described above, this is highly undesirable, in that patients must be evacuated carefully and methodically. Patients and visitors responding to emergency alarms in patient rooms and other patient areas will not realize this and may leave the building without consulting authorized medical staff, or may inadvertently enter a danger zone. The end result is that rescue and hospital personnel may be put in jeopardy searching for a patient who should not

have been notified of the emergency in the first instance.

The need to control emergency response and, if called for, evacuation is critical to a hospital's safe operations. Thus, as a result, limiting emergency notification devices in patient areas where supervised evacuation procedures apply is warranted, as it is necessary to the efficient and safe operation of medical facility procedures for emergency response and supervised evacuation. The Plaintiffs have indicated, after review of the Defendants' evidence and discussions with their own experts, that these assertions are well-taken. The Court, too, finds that limited placement of emergency alarm devices is reasonable and necessary to the safe operations of the medical facilities involved. Further, the Court finds that standard medical practice and healthcare alarm design conform to this presentation of the policies and practices surrounding fire response and supervised evacuation in accredited facilities having such policies. Finally, the Court concludes that, as a matter of law, no part of this description of standard medical practice and healthcare alarm design offends the ADA or conflicts with the requirements of that statute or its implementing regulations and guidelines.

**B. Defendants and Plaintiffs Agree That the ADA and Standard Healthcare Alarm Design Indicate the Placement of Emergency Alarm Notification Devices in Common Areas Open to the Public in the Ordinary Course of Business.**

Defendants have not contended in their motion that the placement of emergency alarm notification devices in hospitals and other medical facilities should be so limited that such devices would not be placed in general public areas of those same facilities. While the Defendants produce much evidence in support of their contention that strobe lights should be limited in hospitals and other medical facilities, the Defendants agree that emergency alarm notification devices should be placed in general areas open to the public, such as cafeterias, vending areas, retail pharmacies, gift shops, chapels, public restrooms, lobbies, waiting rooms, walkways and corridors, business office areas where the public is ordinarily invited (e.g., cashier or personnel office for receipt of applications), conference rooms and classrooms open to the public, and enclosed dressing rooms.[2] In those general areas, informing all of the public about emergencies via visual and audible alarms is sensible and promotes safety.

However, installation of visual alarms in patient rooms in hospitals (including restrooms in patient rooms), operating rooms, surgical suites, surgical preparation areas, recovery rooms, areas where the patient is undergoing or recovering from anesthesia, emergency department examination and treatment rooms, ICU rooms and other special services areas for admitted patients such as NICU or PACU, blood draw and laboratory areas, imaging rooms and diagnostic testing or procedure rooms, psychiatric wards generally, physical therapy training and rehabilitation areas to the extent supervised by medical personnel (except not if exercise areas or equipment are available for use by general public), and other areas where admitted patients

---

2. An enclosed dressing room is one that is a room unto itself with floor-to-ceiling walls and a full door, as opposed to a non-enclosed dressing room which may have full walls but has curtained or other partial covering for the entryway. Enclosed dressing rooms also includes those dressing rooms from which a visual alarm device in the adjacent room or area would not be visible.

are under the supervision of facility personnel, is not supported by industry standards, and is a potentially dangerous practice.

This Court finds the rationales and limitations offered by the Defendants to be rational and warranted in the healthcare industry. The Court believes that the balance of risks favors a limited placement of emergency alarm notification devices as laid out by the parties, and that such limitations as laid out by the parties are in accordance with standard healthcare alarm practice.

Therefore, it is **ORDERED AND ADJUDGED** that:

1. The Americans with Disabilities Act ("ADA"), 42 USC § 12101 et seq., by and through the regulations and guidelines set forth in the Americans with Disabilities Act Accessibility Guidelines ("ADAAG"), mandates that places of public accommodation and commercial facilities shall be accessible to persons with disabilities, which mandate includes generally the placement audible and visual alarms where emergency warning systems are provided.

2. These guidelines also provide that emergency warning systems in medical care facilities may be modified to suit standard health care alarm design practice.

3. It is the standard practice in medical facilities to limit the placement of emergency strobe lights to account for specific medical and life safety concerns. These valid concerns include limiting the placement of emergency strobe lights to prevent causing panic in patients and visitors, which could interfere with established hospital evacuation directions to appropriate safe locations within the facility.

4. It is also the standard practice to limit the placement of emergency strobe lights in medical facilities to avoid disruption of surgical and medical procedures and adverse health impacts to particularly susceptible patients.

5. Strobe lights integrated with emergency alarm systems will not be required pursuant to Title III of the Americans with Disabilities Act and its implementing regulations and guidelines to be placed in patient rooms in hospitals (including restrooms in those patient rooms), operating rooms, surgical suites, surgical preparation areas, recovery rooms, areas where the patient is undergoing or recovering from anesthesia, emergency department examination and treatment rooms, ICU rooms and other special services areas for admitted patients such as NICU or PACU, blood draw and laboratory areas, imaging rooms and diagnostic testing or procedure rooms, psychiatric wards generally, physical therapy training and rehabilitation areas to the extent supervised by medical personnel (except not if exercise areas or equipment are available for use by general public), and other areas where admitted patients are under the supervision of facility personnel; and

6. Strobe lights integrated with emergency alarms systems **will be** required pursuant to Title III of the Americans with Disabilities Act and its implementing regulations and guidelines to be placed in areas of hospital and other facilities into which members of the public would be invited in the ordinary course of business, including: cafeterias, vending areas, retail pharmacies, gift shops, chapels, public restrooms, lobbies, waiting rooms, walkways and corridors, business office areas where the public is ordinarily invited (e.g., cashier or personnel office for receipt of applications), conference rooms and classrooms open

to the public, and enclosed dressing rooms.